IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| RALPH HARRISON BENNING, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> GEORGIA DEP'T OF CORR., *et al.*, ) <br> ) <br> Defendants. ) <br> _____) | CIVIL ACTION NO. 5:19-CV-248 (MTT) |

# ORDER

Ralph Benning, now an inmate at Augusta State Medical Prison ("ASMP"), filed this Religious Land Use and Institutionalized Persons Act ("RLUIPA") action against the Georgia Department of Corrections ("GDC"), the State of Georgia, and Commissioner Timothy Ward.  Docs. 23; 55.  Benning claims the defendants violated RLUIPA by failing to provide him with kosher food that accommodates his religious dietary restrictions.  Docs. 23; 55.  Appropriately, Benning seeks only injunctive relief.  Doc. 23 at 12.  The defendants have moved for summary judgment.  Doc. 62.  For the following reasons, the defendants' motion (Doc. 62) is **GRANTED**.

## I. BACKGROUND[1]

### A. Factual Background

Benning practices Judaism, and his faith mandates that he eat only kosher food. Doc. 23 at 5.  Since at least 2018, Benning has received meals through the GDC's Alternative Entrée Program ("AEP") which, according to the GDC's Alternative Entrée

---

[1] Unless otherwise stated, these facts are undisputed and are viewed in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Program Standard Operating Procedure, exists to provide meals that "accommodate as many religions as possible." Docs. 23 at 11, 66-24 at 1. Not satisfied, Benning filed this action in 2019, claiming that his AEP meals were not kosher. Doc. 23.

On October 6, 2021, Benning and the GDC entered into a settlement agreement, pursuant to which the Court dismissed the case. Docs. 62-12; 53. The settlement resolved all Benning's claims by ensuring that Benning would be served kosher meals. Doc. 62-12. Displeased with the defendants' implementation of the settlement agreement, Benning moved to reinstate this action on April 20, 2023. Doc. 55. The Court granted Benning's motion to reinstate on September 5, 2023.[2] Doc. 60. On February 20, 2024, Benning was transferred from Wilcox State Prison to ASMP.[3] Doc. 78 at 2.

1. *Terms of the settlement agreement*[4]

Although this is not an action for breach of the parties' settlement agreement, the terms of the agreement are relevant. In that agreement, the GDC agreed to implement a supervised process for the preparation and delivery of kosher meals to Benning. Doc. 62-12 ¶ 3. First, the settlement agreement required Benning's pre-packaged meals to be certified kosher. *Id.* ¶ 4. Second, the GDC agreed to double seal the meals to

---

[2] Benning's Motion to Reinstate (Doc. 55) arguably sought relief for breach of the settlement agreement. The defendants argued that while the Court had jurisdiction to reinstate for alleged RLUIPA violations, the Court lacked jurisdiction to address any claim for contractual relief. Doc. 56. When the Magistrate Judge agreed and recommended the denial of Benning's motion (Doc. 58), Benning clarified that he is not asking the Court to enforce the settlement agreement, but "merely to reopen/reinstate the action as provided for in [RLUIPA]." Doc. 59 at 6.

[3] Benning's transfer moots any claims regarding the kosher status of Wilcox State Prison's kitchen. *See McKinnon v. Talladega Cnty.*, 745 F.2d 1360, 1363 ("The general rule is that a prisoner's transfer or release from a jail moots his individual claim for declaratory and injunctive relief.").

[4] While Benning disputes whether the GDC complied with the terms of the settlement agreement (Doc. 66-2 ¶¶ 3-17), he does not dispute that the GDC agreed to the terms in the settlement agreement.

preserve their kosher status.  *Id.* ¶ 5.  Finally, the settlement agreement provided that the meals would be "comparable in nutritional value and caloric intake to the current restricted alternative meal plan."  *Id.* ¶ 6.

In the settlement agreement, Benning and the GDC agreed that the GDC would contract with Innovative Kosher Consulting, LLC ("IKC") or a similar organization that would supervise and certify that Benning's meals were kosher.  *Id.* ¶ 3.  Rabbi Menachem Medel Fellig, the president of IKC, was appointed to supervise the kitchens at GDC facilities and to certify the meals.  Docs. 62-2 ¶¶ 1,2; 62-9 ¶¶ 4-8; 62-12 ¶ 3; 66-2 ¶¶ 1,2.

### 2. Implementation and Compliance[5]

The GDC, through Georgia Correctional Industries ("GCI"), first contracted with IKC to obtain kosher supervision and certification services in August 2021.[6]  Docs. 62-2 ¶ 1; 62-4; 66-2 ¶ 1.  At the time of reinstatement of this action and at all times since then, Benning's AEP meals have been assembled, packaged, and frozen in the AEP kitchen located in Milledgeville, Georgia.[7]  Docs. 62-2 ¶¶ 10, 11, 13-16; 62-9 ¶ 9; 66-2 ¶¶ 10, 11, 13-16.

In 2021, Rabbi Fellig kosher certified the AEP kitchen, and he continues to supervise the kitchen to ensure it remains kosher.  Docs. 62-2 ¶ 1, 8; 62-3 ¶ 4; 62-2 ¶ 1,

---

[5] Benning does not dispute that the following procedures were implemented as a result of the settlement agreement, but he disputes that the procedures were properly followed or produced kosher results.  Doc. 66-2 ¶¶ 10, 11, 13-16.

[6] While Benning does not dispute that GCI contracted with IKC, he denies this allegation as written because he claims the GCI first contracted with Kosher Savannah, LLC to obtain kosher certification.  Doc. 66-2 ¶ 1.

[7] Based on the record, it is unclear when the AEP kitchen was constructed.

8.[8]  Rabbi Fellig reviews all ingredients and recipes used in the AEP kitchen and verifies that only kosher ingredients are used.  Doc. 62-2 ¶ 5; 62-9 ¶ 6; 66-2 ¶ 5.  He also trains the staff and offenders working in the AEP kitchen, and at other GDC facilities, to ensure the AEP meals are prepared according to kosher standards.  Docs. 62-2 ¶ 4; 62-9 ¶ 4; 66-2 ¶ 4.

After the meals are prepared, they are packaged into trays with three compartments.  Docs. 62-2 ¶ 13; 62-3 ¶ 11; 66-2 ¶ 13.  The trays are then wrapped in two layers of plastic.[9]  Docs. 62-2 ¶¶ 15-16; 62-3 ¶ 11.  The first layer of plastic is sealed over the top of the tray, and then the entire tray is sealed in a second layer of plastic.  *Id.*  The trays are frozen and shipped to designated GDC facilities in a freezer truck.  Docs. 62-2 ¶ 16; 62-3 ¶ 11; 66-2 ¶ 16.  The designated facilities reheat the meals and serve them to inmates.  Docs. 62-2 ¶ 10; 66-2 ¶ 10.

However, Benning contends that the defendants have continued to violate RLUIPA by serving him nutritionally deficient meals that are not kosher.  Doc. 55.  Specifically, he claims that the defendants substantially burden his religious exercise because the AEP meals are not always properly sealed, and because the portion sizes of the meals are inconsistent and nutritionally deficient.  *Id.*  The Court granted Benning's motion to reinstate on September 5, 2023, and the defendants moved for summary judgment on November 22, 2023.  Docs. 60; 62.

---

[8] Benning denies that IKC and Rabbi Fellig are legitimate kosher certification entities, but not that Rabbi Fellig certified the AEP Kitchen as kosher.  Doc. 66-2 ¶ 8.

[9] Benning does not dispute that the proper procedure is for each tray to be double sealed, but he does dispute whether the trays are, in fact, properly sealed.  Doc. 66-2 ¶ 16.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex*, 477 U.S. at 324) (alterations in original).  Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings."

*Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 325). The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249-50). Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

### III. DISCUSSION

The defendants argue that they are entitled to summary judgment because Benning has not shown a substantial burden to his religious exercise. Doc. 62-1 at 4-9. The Court agrees.

**A. RLUIPA Framework**

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). However, "a prisoner's request for an

accommodation must be sincerely based on a religious belief and not some other motivation." *Holt v. Hobbs*, 574 U.S. 352, 360-361 (2015).

Courts analyze RLUIPA claims under a burden-shifting test. *Id.* at 362. First, the plaintiff must prove that the defendant placed a substantial burden on his religious exercise. *Ramirez v. Collier*, 595 U.S. 411, 425 (2022) (citing *Holt*, 574 U.S. at 360). "A substantial burden is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004). A substantial burden "can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct."[10] *Id.*

The failure to provide nutritionally adequate, religiously compliant meals can be a substantial burden on an inmate's religion. *See Robbins v. Robertson*, 782 F. App'x 794, 802-03 (11th Cir. 2019).[11] However, a "substantial burden must place more than an inconvenience on religious exercise." *Muhammed v. Jones*, 2023 WL 5499969, at *3 (11th Cir. Aug. 25, 2023) (quoting *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 829-31 (11th Cir. 2020)). Inadequate diets can create a substantial burden on an inmate's religion when he is "forced to choose between abandoning his religious precepts (by eating religiously non-compliant food that was nutritionally

---

[10] The Eleventh Circuit has refrained from providing a bright-line definition of "substantial burden." *Thai Meditation Ass'n of Ala. v. City of Mobile, Ala.*, 980 F.3d 821, 829-831 (11th Cir. 2020). Instead, the court has described the standard as a spectrum. *Id.* On one end, regulations that place no more than an "incidental effect" or "inconvenience" on religious exercise are not sufficient to show a substantial burden. *Id.* On the other end, showing that an inmate is forced or coerced into modifying their behavior or completely abandoning their religious exercise is sufficient to show a substantial burden. *Id.*

[11] Although *Robbins* is an unpublished decision and thus non-binding, its facts are very similar to those before the Court and its reasoning is persuasive.

adequate) or suffering serious health consequences (by eating nutritionally inadequate food that was religiously compliant)." *Id.*

If a plaintiff shows that the defendant substantially burdened his exercise of religion, the burden shifts to the defendant to show that its policy "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that governmental interest."  42 U.S.C. § 2000cc-1(a); *see also Holt,* 574 U.S. at 362.

## B. Substantial Burden on Religious Exercise

The defendants argue that they are entitled to summary judgment because Benning has not shown a substantial burden to his religious exercise.[12]  Doc. 62-1 at 4-9.  Benning claims that his religious exercise is substantially burdened because 1) the packaging of the AEP meals call their kosher status into question, 2) the AEP meals are not nutritionally adequate, and 3) Rabbi Fellig does not provide reliable kosher certification.  Docs. 66-22; 112.

### 1. Packaging of the AEP Meals

Benning does not argue that his meals from the AEP Kitchen are not prepared using kosher ingredients and kosher equipment.  Rather, he claims that his meals have lost any kosher integrity by the time they are served to him because the serving trays and plastic wrap are not kosher certified and because the meals are not sealed.  Doc. 66-22 at 1-12.

---

[12] The defendants also challenge the scope of available relief.  Doc. 62-1 at 8-9.  It is not necessary to reach that issue.

a. The kosher certification of the packaging materials

Benning claims he cannot be certain that his meals are kosher because "the trays and sealing plastic [used to package the meals] show no kosher certification."[13] Docs. 66-22 at 9; 66-18 ¶ 33.

Regarding the trays, Benning argued in his initial response to the defendants' motion for summary judgment that the trays are not kosher because they do not have a kosher certification.  Doc. 66-22 at 6.  Then, in his response to the defendants' supplemental brief (Doc. 78), Benning appears to concede that the trays are kosher when he states that the defendants "produce evidence that the trays for the meals are kosher certified."  Doc. 112 at 10.  Thus, it is unclear whether Benning maintains his argument that the trays are not kosher.  But if he does, his argument fails.  The defendants produced evidence of a kosher certification from the Orthodox Union and affidavit testimony from Rabbi Fellig and the GCI dietician advisor confirming that the trays are kosher certified.  Docs. 71-2 ¶ 8; 71-4; 71-5 ¶ 7.  Benning stated in his declaration that the trays lack a kosher certification, pointing to an invoice that does not state the trays are kosher.  Doc. 62-5 at 2-3.  However, Benning has not shown that the trays must have a symbol to be kosher or that the invoice would indicate whether the trays are kosher.

Second, Benning argues that the plastic wrap used to seal the meals is not kosher.  Doc. 66-18 ¶ 33.  He claims that any plastic used to wrap food items must be

---

[13] Benning also argues that the bread used to make sandwiches is not kosher because he was given a package from a loaf of bread that had no kosher certification.  Doc. 66-18 ¶ 15.  However, the defendants produced affidavit testimony from the GDC Dietician Advisor, who testified that the bread is kosher.  Doc. 71-2 ¶ 7.  He explained that the bread comes in bulk-sized boxes, and the kosher certification is on the box rather than the individual bags.  *Id.*  He also provided the kosher certification of the bread and a photo of the kosher label on the box.  Docs. 71-3; 71-4.  That affidavit testimony and the proof of certification are unrefuted.

kosher due to "additives and/or lubricants used in manufacturing the plastics," and argues that the plastic wrap is not kosher because it does not contain a kosher symbol. *Id*. But Benning only speculates that the plastic is not kosher. He does not show that kosher plastic wrap normally contains such a symbol or that the plastic contains the type of additives that would compromise his meals. More importantly, Benning points to no evidence that plastic wrap must be certified kosher or that plastic wrap can compromise the kosher integrity of food. Rabbi Fellig, on the other hand, testified that "[u]se of the plastic film sealing material on the food trays does not compromise the kosher status of the meal." Doc. 71-5 ¶ 8. Benning's speculations are not sufficient to show that the defendants substantially burdened his religion. Fed. R. Civ. P. 56(c)(1); *see Robinson v. Sauls*, 46 F.4th 1332, 1334 n. 7 (11th Cir. 2022) ("'Speculation does not create a genuine issue of fact, instead; It creates a false issue, the demolition of which is a primary goal of summary judgment.'" (quoting *Cardoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)); *see also Sprouse v. Ryan*, 346 F. Supp. 3d 1347, 1359 (D. Ariz. 2017) ("[The plaintiff] demonstrates only a fear of contamination but presents no evidence that actual contamination has taken place or that this fear has affected his kosher dietary practice.").

   b. The sealing of AEP meals

Benning also claims that his AEP meals are not kosher because they are not properly sealed. Doc. 66-18. Benning and Rabbi Fellig agree that the AEP trays maintain their kosher status if they are double sealed, even if reheated in a non-kosher environment. Docs. 66-22 at 6; 66-18 ¶ 6; 62-9 ¶ 12. Benning claims that the seals on

his AEP meals are often breached, causing them to lose their kosher status.[14]  Doc. 66-18 ¶ 6.  The defendants argue that Benning's "description of what constitutes a compromised seal is unreasonable."  Doc. 62-1 at 6.  Regardless of the reasonableness of Benning's assessments, he does not provide evidence that the purported sealing issue creates a substantial burden on his religion.

Benning's argument turns on his claim that some of his meals contain condensation between the inner and outer seals.  Docs. 62-14; 62-15; 62-16; 62-20; 66-22 at 11-12.  Benning opines that "the presence of condensation with high density nucleation in a supposedly static closed system is evidence that the system is not closed."  Doc. 66-18 ¶ 6; 62-14; 62-15; 62-16; 62-20.  In other words, he claims that condensation between the first and second layers of plastic shows that there is a breach in the tray's inner seal.[15]  Id.  He does not argue that both seals are sometimes breached.  In any event, he provides no evidence to support his condensation theory other than his claimed pre-incarceration[16] work experience during which he learned about "the physics of heating and cooling of solids."  Doc. 66-18 ¶ 6.  Benning's conclusory statement about the cause of any condensation, without evidentiary support,

---

[14] In their initial brief in support of summary judgment, when Benning was still at Wilcox State Prison, the defendants argued that even if the seal is breached, the meals are kosher because they are prepared and reheated in a kosher environment.  Doc. 62.  After Benning was transferred to ASMP, the defendants abandoned that argument and do not rely on any arguments that the kitchen at ASMP is kosher.  Doc. 99. Thus, for summary judgment purposes, the Court assumes the AEP meals must be sealed at the AEP kitchen and must remain sealed until served.

[15] Benning kept detailed charts of the content and weight of his meals.  See, e.g., docs. 66-16; 66-19; 66-20.  One column, titled "Seal," has entries of "N" and "Y."  Doc. 62-11 at 46 l. 21-25.  At his deposition, Benning explained that "N" means that the tray was not sealed.  Id.  Benning also testified that he would mark a tray as not sealed if it contained condensation in between the inner and outer seals.  Doc. 62-11 at 65. However, all of Benning's records of broken seals are from Wilcox State Prison, and he has not produced any evidence that sealing issues exist at ASMP.

[16] Benning has been incarcerated since 1986.  Doc. 23 at 1.

is not sufficient to survive summary judgment. [17]  *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991) ("The evidence presented cannot consist of conclusory allegations or legal conclusions").

Other than that, Benning points to a meal served to him while he was being deposed.  Docs. 62-11 at 53 l. 5; 66-22 at 9.  At the deposition, Benning stated that his tray of heated food was "leaky."  Doc. 62-11 at 53 l. 17-19.  The defendants' counsel then took pictures of the meal and asked Benning to explain why he believed the tray was not sealed.  *Id.* at 53 l. 17-19.  Benning then highlighted areas where he claims there was condensation, bubbling, and food underneath the inner seal that indicated a breach.  Docs. 62-11 at 53; 62-14; 62-15; 62-16; 62-17; 62-18; 62-19; 62-20; 62-21; 62-22; 66-11; 66-22 at 9.  Although Benning's breach theories are hard to follow, the Court assumes, without deciding, that on occasion one or both seals may fail.

However, that does not necessarily place a substantial burden on Benning's religious exercise.  Here, there is unrefuted evidence that ASMP staff will replace any trays with breached seals.  Docs. 78-1 ¶ 51; 78-10 ¶ 14.  The ASMP food director, Shassone Ligon, provided affidavit testimony that if an inmate has not yet left the dining

---

[17] Moreover, the Court questions whether Benning's opinion of what caused the condensation is admissible.  Rule 701 of the Federal Rules of Evidence prohibits a lay witness from providing an opinion unless it is: 1) based on firsthand knowledge or observation, 2) helpful in resolving issues related to the case, and 3) not based on scientific, technical, or other specialized knowledge.  Here, Benning relies on his background, including his experience in the navy, in engineering school, and working on nuclear power systems, to support his opinion that condensation collected between the seals of the trays means there is an improper seal.  Doc. 66-18 ¶ 6.  Benning's opinion about the cause of the condensation is based on scientific and technical knowledge and is, therefore, an improper lay opinion.  *See Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 71 F.4th 894, 908 (11th Cir. 2023) ("But a hypothesis about causation is outside a lay witness's competency, even if the lay witness happens to have the expertise to draw such conclusions."); *see also Ojeda v. Louisville Ladder Inc.*, 410 Fed. App'x 213 (11th Cir. 2010) (holding that an opinion that a ladder was defective due to its design was an improper lay opinion because it was based on scientific knowledge); *Smith v. Crounse Corp.*, 72 F.4th 799, 807 (7th Cir. 2023) (holding that an opinion regarding the cause and implication of rust and marks on a barge was an improper lay opinion).

room and receives a meal that is improperly sealed, the kitchen staff will give him a new meal.[18]  Doc. 78-10 ¶ 14.  Benning has not shown how the sealing issue substantially burdens his religion when any non-compliant meal will be replaced.  *See Dorman v. Aronofsky*, 36 F.4th 1306, 1314 ("It is admittedly an inconvenience, but it does not pressure, force, or coerce [the plaintiff] or any other Jewish inmates to abandon, forego, conform, or delay any of their religious beliefs or practices.").

      c.  Rabbi Y. Weiss's Declaration

Finally, Benning cites the declaration of Rabbi Y. Weiss, which discusses general prison conditions, to support his argument that the AEP meals are not kosher.  Docs. 66-14; 66-22 at 5.  Rabbi Weiss's declaration, signed in 2018, does not provide any evidence that Benning's AEP meals are not being prepared according to kosher standards.

First, the declaration was signed three years before Benning's Settlement Agreement and before the GDC adjusted its policies to meet Benning's demands.  Doc. 66-14.  Thus, Rabbi Weiss had no personal knowledge of how Benning's meals are prepared.  Instead, Rabbi Weiss sweepingly opined that "Jewish inmates absolutely should not eat any food that is prepared or cooked in prison kitchens" because it is "obviously not possible or practical in prison facilities" to comply with kosher standards.

---

[18] In his response to the defendants' supplemental briefing after Benning was transferred to ASMP, Benning did not dispute, or even address, the affidavit testimony that he can receive a new tray if he receives one with an improper seal.  Doc. 112.  After the defendants filed their supplemental brief and supplemental statement of undisputed facts, Benning requested leave to respond to the defendants' assertion that the ASMP kitchen is kosher.  The Court denied that request after the defendants clarified that, for summary judgment, they do not rely on the assertion that the ASMP kitchen is kosher.  However, Benning did not seek leave to respond to the defendants' assertion that he can receive a replacement tray at ASMP (Doc. 78-1 ¶ 51) even though the defendants made clear that they planned to rely on that testimony (Doc. 99 at 2).  Ligon's affidavit serves as an admission by the defendants that they will replace Benning's meals if he receives one that is improperly sealed.

Doc. 66-14 ¶¶ 4-6.  He also opined that the then-in-effect GDC Standard operating procedures—the current procedures were adopted in 2020—do not ensure that the AEP meals meet kosher standards.  Docs. 66-14 ¶ 8; 66-24 at 1.  Rabbi Weiss does not offer any evidence of the kosher status of Benning's meals and his dated, categorical opinions are not sufficient to create a genuine issue of material fact that Benning's meals are certified kosher pursuant to procedures adopted long after Wiess opined that prison kitchens cannot prepare kosher meals.

Accordingly, Benning has not produced evidence that the preparation and packaging of his AEP meals substantially burdens his religion.[19]

*2. Inconsistent Portion Sizes*

Benning also claims the defendants violated RLUIPA by failing to provide him with meals that were nutritionally adequate.  Doc. 66-22 at 12-14.  However, Benning fails to provide evidence that the portion sizes of his meals substantially burden his religious exercise.

Benning claims that his meals are inadequate because their caloric value is insufficient.  Doc. 66-22 at 12-13.  Benning, an experienced, thorough, and inventive litigator, based this opinion on the detailed charts he kept at Wilcox State Prison.  *Id.* at 12.  On these charts, Benning tracked each of his meals and recorded the difference between the calories he received and the calories contained in the menus provided to him by the GDC.  See Docs. 66-5; 66-6; 66-7; 66-9; 66-16; 66-19.  He calculated the

---

[19] Benning also claims that the delivery process for his meals has not been kosher-certified, which may compromise them.  Doc. 66-22 at 7.  However, Benning admits that meals maintain their kosher status if they are properly sealed.  Doc. 66-18 ¶ 6.  Thus, Benning's argument regarding the delivery process fails for the same reasons as his arguments regarding the sealing issues.

weight of each food item by measuring it in a one-ounce medical cup. Doc. 62-11 at 42-46. Once he determined how many ounces he received, he cross-referenced his portion sizes with the portions listed on the GDC menus and calculated the calories on a pro-rata basis. *Id.* at 42. Based on his calculations, Benning claims he received an average of 2,031 calories per day (which he claims was approximately 40% fewer calories than the menu provided). Doc. 66-22 at 12. The defendants, perhaps generously, concede that Benning has provided enough evidence to create an issue of fact as to the portion sizes of his meals, but they argue that his claim fails because he has not shown that receiving only 2,031 calories per day substantially burdens his religion. Doc. 71 at 7. The Court agrees.

To show a substantial burden, Benning needs to show that his low-calorie meals had more than an incidental effect on his religious exercise. *Thai Meditation Assoc. of Ala.*, 980 F.3d at 731. For example, Benning could demonstrate a substantial burden by providing evidence that his meals caused him to modify his behavior or forced him to "choose between abandoning his religious precepts (by eating religiously non-compliant food that was nutritionally adequate) or suffering serious health consequences (by eating nutritionally inadequate food that was religiously compliant)." *Robbins*, 782 F. App'x at 802-03; *Thai Meditation Assoc. of Ala.*, 980 F.3d at 731. Benning does not provide any evidence of weight loss or other adverse health effects from his allegedly low-calorie meals. And, more importantly, he does not provide evidence that the purported calorie deficit caused him to change his actions or otherwise "abandon his religious precepts" to avoid suffering "serious health consequences." *Robbins*, 782 F. App'x at 802; *see also Sprouse*, 346 F. Supp. 3d at 1357 ("Nonetheless, [the plaintiff]

fails to present specific facts or evidence to show that receiving just 2150-2200 calories a day is inadequate, thereby forcing him to forgo or significantly alter his religious practice."). Accordingly, Benning has failed to show that the portion size of his kosher meals substantially burdens his religion.[20]

### 3. Certification by Rabbi Fellig

Even though Benning agreed to the appointment of IKC to monitor the AEP kitchen and certify kosher meals, Benning, in a supplemental brief, now argues that Rabbi Fellig is not trustworthy. Doc. 112 at. 12-14. As best the Court can tell, Benning argues Rabbi Fellig cannot be trusted because Benning cannot be sure that Rabbi Fellig certifies the meals according to Benning's definition of kosher. Doc. 112 at 2, 6-7, 12-13.

Benning now claims that his definition of kosher requires that he eat only food certified as "glatt kosher" by one of several "trusted" certifying entities.[21] *Id.* at 6-7. All other certification entities, Benning states, "would have to be investigated on a case-by-case basis." *Id.* at 6. However, Benning does not show that the defendants' use of IKC and Rabbi Fellig substantially burdens his religion.

First, Benning fails to define "glatt kosher" or point to evidence that Rabbi Fellig's certification services fail to comply with his "glatt kosher" restriction. By failing to define what he means by "glatt kosher," Benning also fails to show that his religious exercise

---

[20] Benning suspects that pilfering is responsible for his smaller portions. Doc. 66-18 ¶ 35. Whatever the cause, and even though Benning has not shown that his low calorie meals are a substantial burden, it seems that the GDC could easily find a way to give him regular sized meals.

[21] Benning lists the following acceptable kosher certifying organizations: The Union of Orthodox Jewish Congregations, Star-K Kosher Certification, the Central Rabbinic College, Soloveichik Rabbinic Supervision, KOF-K Kosher Supervision, Organized Kashrus Laboratories. Doc. 112 at 6-7.

would be substantially burdened if he did not receive food that is certified "glatt kosher."[22]

Second, Benning states that he must have food certified by one of *his* preferred certifying organizations.  Doc. 112 at 6.  And he no longer prefers Rabbi Fellig and IKC.  *Id.*  But Benning does not say how the defendants' failure to utilize a certifying organization of his choosing substantially burdens his religious exercise.  Rabbi Fellig stated that "Innovative Kosher provides certification according to the guidelines of the Code of Jewish Law."  Doc. 114-1 ¶ 3.  The Code of Jewish Law, Rabbi Fellig stated, is the "foundation for all Orthodox Kosher certifying agencies."  *Id.* ¶ 7.  Benning does not provide evidence that Rabbi Fellig's certification uses different standards or is any less trustworthy than the organizations he prefers.[23]

Benning argues, in one of his briefs, that Rabbi Fellig's certification is not trustworthy because Rabbi Fellig is a member of the "Lubavitch/Chabad" sect of Judaism.  Doc. 112 at 12.  Benning claims that Rabbi Fellig's certification is questionable because Lubavitch/Chabad members believe that Jewish prisoners are not bound by religious laws.  *Id.*  First, Benning's statement in a brief is not evidence.  *See Travaglio v. American Exp. Co.*, 735 F.3d 1266, 1269 (11th Cir. 2013).  Second,

---

[22] Rabbi Fellig defines "glatt kosher" as "the requirement that meat come from an animal with smooth lungs."  Doc. 114-1 ¶ 5.  Rabbi Fellig's definition is consistent with that of Orthodox Union Kosher, one of Benning's trusted organizations.  *See* Rabbi David Arfa, *But is it Glatt Kosher,* July 9, 2019 https://oukosher.org/blog/feature/what-exactly-is-glatt-kosher/.  However, the Orthodox Union recognizes that the term is often used colloquially to refer to any type of food that is unquestionably kosher, or "super-kosher."  *Id.*

[23] Benning argues that because IKC was incorporated just before it contracted with the GDC, Rabbi Fellig cannot be trusted.  Doc. 112 at 12.  First, he provides no proof of the date of IKC's incorporation.  But more importantly, Benning does not show that IKC's corporate age has any correlation to Rabbi Fellig's knowledge or training.  Thus, he fails to establish that Rabbi Fellig's certification substantially burdens his religion.

Rabbi Fellig provided affidavit testimony that he follows the Code of Jewish Law when certifying Benning's meals, and Benning has produced no evidence to the contrary. [24] Doc. 114-1 ¶ 7.

Further, while RLUIPA requires the defendants to provide Benning with kosher meals, it does not require them to give Benning his preference of certifying organizations.  *See Robinson v. Jackson*, 615 Fed. App'x 310, 314 (6th Cir 2015) ("[prisoners] have a constitutional right to be served meals that do not violate their sincerely held religious beliefs.  But there is no constitutional right for each prisoner to be served the specific food he desires." (internal citations omitted)).  Here, Benning, again the experienced litigator, after mounting one wave of arguments, attempts to move the goalposts and force the defendants to let him choose who certifies kosher meals.  However, the Supreme Court has made clear that RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety."  *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005).  A court "must give 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'"  *Smith v. Owens*, 13 F.4th 1318, 1329 (11th Cir. 2021) (quoting *Cutter*, 544 U.S. at 723).  And while the Court recognizes that "this deference is not…unlimited," the Supreme Court has stated that "should inmate requests for religious accommodations become

---

[24] Benning also appears to argue that Rabbi Fellig is untrustworthy because the GCI originally contracted with another Rabbi, Rabbi Yerucham Schochet, to oversee the AEP kitchen. Docs. 66-2 ¶ 1; 66-18 ¶ 20-22.  Benning claims that the defendants' attorney told him that the defendants ultimately went with Rabbi Fellig because Rabbi Schochet refused to certify the AEP kitchen as kosher. Doc. 66-18 ¶ 22. Benning's claim has no evidentiary support.  GCI's Deputy Director of Food Service, Bobby Wiseman, provided a declaration that the GCI chose not to contract with Rabbi Schochet because he was causing delays in the design of the AEP kitchen.  Doc. 71-1 ¶¶ 4-5.

excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition." *Cutter*, 544 U.S. at 722.

Benning has provided no evidence that the defendants' use of IKC and Rabbi Fellig to oversee and certify the AEP kitchen substantially burdens his religious exercise, and RLUIPA does not guarantee him his choice of certifying organizations. Benning has, thus, failed to create a genuine issue of material fact that the defendants substantially burdened his religion by contracting with IKC to certify the AEP meals.

## C. The Establishment Clause

Benning references the Establishment Clause of the First Amendment in his response to the defendants' supplemental brief.  Doc. 112 at 4.  The defendants respond that Benning cannot raise a First Amendment challenge because his complaint does not include a First Amendment claim.  Doc. 116 at 5-6.  It does not appear to the Court that Benning intended to assert an Establishment Clause claim; it seems more likely that he was only reminding all of the government's obligation to avoid entanglement in religion.  But to the extent that Benning's brief attempts to add a new claim, that claim is not valid because "a plaintiff cannot amend their complaint through argument made in his brief in opposition to the defendant's motion for summary judgment."  *Miccosukee Tribe of Indians of Fla. V. United States*, 716 F.3d 535, 559 (11th Cir. 2013)

## III. CONCLUSION

In this Court's long experience, the Court has often questioned the GDC's commitment to the proper discharge of the constitutional and statutory obligations it

owes to inmates in its care.  That is not the case here.  Ralph Benning is perhaps the most effective litigator in GDC custody.  If any advocate, lay or professional, could find fault with the GDC's AEP program, it would be Ralph Benning.  Benning's considerable efforts to find fault have failed, and the defendants' motion for summary judgment (Doc. 62) is **GRANTED**.

    **SO ORDERED**, this 18th day of December, 2024.

                                            S/ Marc T. Treadwell
                                            MARC T. TREADWELL, JUDGE
                                            UNITED STATES DISTRICT COURT